UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



Hamilton International Ltd.,

                Plaintiff,

      –v–

Vortic LLC, *et al*.,

                Defendants.

17-CV-5575 (AJN)(OTW)

FINDINGS OF FACT &
CONCLUSIONS OF LAW

ALISON J. NATHAN, District Judge:

       This litigation involves a watch previously sold by Defendant Vortic LLC ("Vortic"). Plaintiff Hamilton International Limited ("Hamilton"), a Swiss watchmaker, argues that the watch infringed on its trademark and brings claims of infringement, counterfeiting, dilution, and unfair competition. A one-day bench trial was held on February, 19, 2020.

       For the following reasons, the Court finds that the product at issue was unlikely to cause confusion and enters judgment for Defendants on all claims.

**I.    BACKGROUND**

       The background of this case is described in detail in the Court's previous Opinions, and it only briefly recounts it here. *See* Dkt. No. 115 ("SJ Op."); Dkt. No. 128 ("Reconsideration Op."). Vortic is a watchmaker that specializes in restoring antique pocket watches and converting them into wristwatches. *See* Custer Direct Testimony Affidavit ("Custer Aff.") ¶¶ 15-17. Vortic's majority owner and co-founder is Defendant Robert Custer. Tr. 9-10. From 2014 to 2016, Vortic sold a watch called "The Lancaster," named after Lancaster, PA, where the Hamilton Watch Co. was originally located. Custer Aff. ¶¶ 21, 34. It was made with a historic, restored, "Railroad-Era" movement produced by the Hamilton Watch Company. *Id.* ¶ 22. In

1

this context, "movement" refers to the internal mechanism of the watch with antique hands and face attached. All of the antique parts Vortic uses come from 1894 to 1950, although it is not clear exactly where parts for the Lancaster fall in that range. Tr. 78. The other parts of the wristwatch are produced by Vortic and the ultimate product is also assembled by Vortic. Custer Aff. ¶ 17, 18, 22. The "Hamilton" mark remains visible on the antique face of the watch. *See* Exhs. I, 12. The Lancaster has a Gorilla Glass back which makes the internal workings visible, and "Hamilton" can also be seen on one part of the movement. *Id.* Around the ring in the rear of the watch is engraved "Vortic," along with "The Lancaster" and a serial number. *Id.* In total, 58 watches were either sold or gifted. Tr. 14. Hamilton, which is still in existence, but has since relocated to Switzerland, became aware of The Lancaster and sent Vortic a cease and desist letter. On July 21, 2017, Hamilton launched this action against Vortic and the company's founder, Robert Custer.[1] *See* Dkt. No. 1.

## II.     TRADEMARK INFRINGEMENT

### A.     Legal Standard

The Court recounts the applicable legal standard as described in its summary judgment opinion. *See* Dkt. SJ Op. at 3-5. A "plaintiff in a trademark infringement action must show that defendant (1) without consent, (2) used in commerce, (3) a reproduction, copy or colorable imitation of plaintiff's registered mark, as part of the sale or distribution of goods or services, and (4) that such a use is likely to cause confusion." *Gruner + Jahr USA Publ. v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir. 1993) (citing 15 U.S.C. § 1114(1)(a)). Plaintiff bears the burden of proving each of these elements by a preponderance of the evidence. Only the likelihood of confusion is in dispute in this case. Plaintiff bears the burden to demonstrate a likelihood of

---

[1] Plaintiff appears to have accidentally sued another entity, Vortic Technology LLC, that has no connection to the Lancaster. The claims against it were dismissed at trial without objection. Tr. 154.

confusion by a preponderance of the evidence. *See Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 391 (2d Cir. 2005).

The Second Circuit applies the landmark, multifactor test from *Polaroid Corp. v. Polarad Electronics Corp.* when determining the likelihood of confusion in trademark cases. *See* 287 F.2d 492 (2d Cir. 1961). This analysis looks to "[1] the strength of his mark, [2] the degree of similarity between the two marks, [3] the proximity of the products, [4] the likelihood that the prior owner will bridge the gap, [5] actual confusion, and [6] the reciprocal of defendant's good faith in adopting its own mark, [7] the quality of defendant's product, and [8] the sophistication of the buyers" as relevant variables. *Id.* at 295. The touchstone when considering the *Polaroid* factors is the existence of "a probability of [consumer] confusion, not a mere possibility." *Streetwise Maps v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998). In other words, "whether numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark." *Playtex Prods. v. Georgia-Pacific Corp.*, 390 F.3d 158, 161 (2d Cir. 2004) (internal quotation marks and citations omitted).

However, the *Polaroid* factors are not to be applied as a "mechanical process," nor are they exhaustive. *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 37 (2d Cir. 2016) (quoting *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000)). As the Second Circuit has cautioned repeatedly, "depending on the complexity of the issues, 'the court may have to take still other variables into account.'" *Savin Corp. v. Savin Group*, 391 F.3d 439, 456 (2d Cir. 2004) (quoting *Polaroid*, 287 F.2d at 495)). In cases such as this one, involving modified genuine products, the Supreme Court has found whether the defendant adequately disclosed the origins of the product to be dispositive. *See Champion Spark Plug Co. v. Sanders*, 331 U.S. 125 (1947); *Prestonettes, Inc. v. Coty*, 264 U.S. 359 (1924); *see also Nora Beverages,*

*Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 119 (2d Cir. 2001) ("Although no one factor is necessarily dispositive, any one factor may prove to be so.").

In *Champion*, the defendant sold repaired and reconditioned used spark plugs that were initially manufactured by the plaintiff. *See* 331 U.S. at 126. The Supreme Court held that the defendant could continue to display the plaintiff's trademark on his sparkplugs, so long as the sparkplugs also had "Repaired" or "Used" conspicuously stamped on them and their packaging indicated that the defendant had done the restoration. *Id.* at 127, 130. The Court explained that in such circumstances, "[f]ull disclosure" of the products' origins was "all the protection to which [the plaintiff] was entitled." *Id.* at 130. Since the sparkplugs were second-hand goods and consumers would naturally expect a used or repaired good to be inferior, conspicuously labeling the goods as used or repaired constituted full disclosure. *Id.* It was otherwise permissible for the goods to retain the Champion trademark even if it means that the defendant benefits from plaintiff's goodwill or "gets some advantage from" plaintiff's mark. *Id.* The Court cautioned that it would be possible to imagine a case "where the reconditioning or repair would be so extensive or so basic that it would be a misnomer to call the article by its original name, even though the words 'used' or 'repair' were added." *Id.* at 129. Outside those rare circumstances, however, a refurbished product may bear the original maker's mark.

Courts in this Circuit have likewise found the adequacy of disclosure, or lack thereof, to be dispositive when determining the likelihood of confusion caused by a modified genuine product. *See, e.g.*, *H.L. Hayden Co. v. Siemens Medical Sys., Inc.*, 879 F.2d 1005, 1022-24 (2d Cir. 1989); *Cartier v. Aaron Faber, Inc.*, 396 F. Supp. 2d 356, 359 (S.D.N.Y. 2005); *Bumble Bee Seafoods, L.L.C. v. UFS Indus., Inc.*, No. 04-cv-2015, 2004 U.S. Dist. LEXIS 13897, at *6-*15 (S.D.N.Y. July 20, 2004); *Eastman Kodak Co. v. Photaz Imports*, 853 F. Supp. 667, 674 (W.D.N.Y. 1993), *aff'd*, 28 F.3d 102 (2d Cir. 1994) (table). These decisions look to *Champion*

4

as a substitute or crucial supplemental factor to a traditional *Polaroid* likelihood of confusion analysis.  "Full disclosure," *Champion*, 331 U.S. at 130, thus matters if it prevents "numerous ordinary prudent purchasers" from being "misled or confused as to the source of the product," *Playtex Prods.*, 390 F.3d at 161.

In determining the likelihood of confusion, the Court will therefore give strong weight to the "full disclosure" factor, while also considering the traditional *Polaroid* variables it finds to be applicable.  *See Int'l Info. Sys. Sec. Certification Consortium v. Sec. Univ., LLC*, 823 F.3d 153, 160 (2d Cir. 2016) ("[C]ases may certainly arise where a factor is irrelevant to the facts at hand.") (quoting *Arrow Fastener Co. v. Stanley Works,* 59 F.3d 384, 400 (2d Cir. 1995)).

        **B.**       **There is "Full Disclosure" Under *Champion***

The Court finds that Vortic's advertisements and marketing materials, as well as the watch itself, provided full disclosure under *Champion.*

First, the Court finds that all of Vortic's advertising and marketing materials in the record would accurately convey to the ordinary prudent purchaser that the only connection of any kind between Hamilton and Vortic is that Vortic used antique Hamilton watch movements and parts for its Lancaster watch.  For example, the Vortic website's description of the watch clearly stated that the Lancaster was one of "Vortic's flagship line of watches" and that "[a]ll of the components (movement, dial, hands) between the two Gorilla Glass crystals ~100 years old and started their life in a Railroad-era pocket watch made by the Hamilton Watch Company."  Exh. 2 to Custer Aff.  The website's product description further states that Vortic uses "vintage movements whose case has been scrapped for its precious metal value, and meticulously restores the inner workings in order to build a completely custom watch around it."  *Id*.  While the Hamilton mark is visible in a picture, Vortic's logos predominate.  *Id.*; *see also* Custer Aff. ¶ 42.

5

Likewise, in a Vortic magazine advertisement, the ad copy states in part that "[e]ach piece is custom fabricated using railroad era, American made pocket watch movements to create a timeless one of a kind wristwatches." Exh. A.  And while the Hamilton mark is also visible on a picture, the Vortic mark again clearly predominates over it.  Any viewer of this advertisement would come away with an accurate understanding of the relationship between Vortic and Hamilton.  *Id.*; *see also* Exh. 8 (watch forum post explaining that Vortic "salvages" antique pocket watch movements and restores them for their watches); Exh. 9 (twitter post from Vortic's account stating that the Hamilton component is in "our [i.e. Vortic's]" watch); Exh. 31 (Kickstarter posting stating that Vortic uses "vintage pocket watch movements" including Hamilton's and explaining manufacturing and restoration process).  Mr. Custer testified that these advertisements are consistent with Vortic's general approach to convey how it makes the watches.  He also testified that Vortic includes details about its manufacturing and the incorporation of the antique movements with every watch it sells.  Custer Aff. ¶¶ 40-44; *see also* Tr. 26-27.

Vortic's website and marketing materials do not suggest any affiliation or sponsorship between Vortic and Hamilton but rather convey accurately that the restored Hamilton movements and parts are only "constituent[s] in the article now offered as new and changed." *Prestonettes*, 264 U.S. at 369.  This is full disclosure that would prevent substantial numbers of ordinary prudent purchasers from being confused.

The Court also finds that the watch itself, viewed in isolation, provides full disclosure by the standard elucidated in *Champion*.  Having viewed a physical example of a Lancaster as well as pictures in the record, the Court finds that the watch obviously presents to a viewer as restored antique pocket watch movement, face, and hands that have been reincorporated into a new wristwatch.  *See* Exhs. I, 12.  This would be true even if the watch was viewed only from the

6

front or only from the back, and even if the viewer did not have any prior knowledge about the watch. Several factors lead the Court to this conclusion, including that the watch is much larger than the typical wristwatch and that there is a large knob at the 12 o'clock position which is immediately recognizable as being from a pocket watch, rather than a wristwatch which usually has the movement at 3 o'clock. Additionally, the hands, face, and movement have a patina, style, and look that convey that they are restored antiques. Furthermore, the Court finds that the watch itself would convey to any ordinary prudent purchaser that the watch was made by Vortic and that the Hamilton mark is only displayed because Hamilton created the original movement, face, and hands that have subsequently been restored. The Court notes that "Vortic," "Lancaster," and the serial number are all prominently engraved on the case while the Hamilton mark is only visible inside the glass case, on a movement and face that appear obviously antique.

While the disclosure provided by the watch is not equivalent to the more complete disclosure provided by Vortic's advertisements, such detail from the product itself is not required under *Champion*. It was sufficient in that case that the sparkplugs clearly conveyed that they were "used" or "repaired." *Champion*, 331 U.S. at 127, 129. While the watches in this case have been modified to a greater extent than the sparkplugs in *Champion*, the Court finds that the Lancaster itself provides more disclosure as to the extent of the modification and restoration. And the Court notes that the only components that do bear the Hamilton trademark, the face and the movement have, as in *Champion*, been "restor[ed], so far as possible, of their original condition." *Champion*, 331 U.S. at 129. It is thus no "misnomer to call [them] by [their] original name." *Id.*; *see also Prestonettes*, 264 U.S. at 369. Moreover, the presence of full disclosure prevents undue interference with the ability of Plaintiff to control its reputation.

As Plaintiff points out, the Lancaster does not have any particular words stamped on it that on their own create full disclosure, as was the case in *Champion*. But if the overall design

7

and the engravings, rather than a particular stamp, convey full disclosure with sufficient clarity and conspicuousness, there is no reason why the result should be any different.  *See Ford Motor Co. v. Ultra Coachbuilders, Inc.*, Case No. EDCV 00-00243-VAP, 2000 U.S. Dist. LEXIS 20173, at *15-*16 (C.D. Cal. July 11, 2000) (stretch limousine version of Ford automobile did not infringe on Ford's trademark because the modifications were "apparent").  Indeed, the Court believes that the Lancaster compares favorably with the sparkplugs from *Champion*.  Those sparkplugs did not bear information indicating that someone other than the original manufacturer had done the restoration.  Any defects in the restoration process may have been laid at the feet of the original manufacturer.  In contrast, the Lancaster not only provides full disclosure as to the extent of the modification and restoration, but also provides full disclosure as to the identity of the restorer and modifier.  Thus, a viewer of a Lancaster in isolation would have an even more accurate picture of the product than a viewer would have received from the unpackaged sparkplugs in *Champion*.

Plaintiff does not dispute that the existence of full disclosure can be a relevant factual question, but rather makes several attempts to find fault with the quality of the disclosure. Plaintiff's principal argument is that Defendants must come forward with evidence that the full disclosure is effective.  As an initial matter, Mr. Custer's testimony to the effect that neither he nor his company encountered individuals who were confused about the relationship or lack thereof between Vortic and Hamilton would seem to meet this burden, particularly given Vortic's small size.  *See* Custer Aff. ¶¶ 29, 48-50.  But more importantly, the case law on which Plaintiff relies for this proposition did not involve modified genuine products.  *See, e.g. Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*, 832 F.2d 1311, 1316 (2d Cir. 1987). *Champion*, which did involve a modified genuine product, did not place such a burden on the defendants and neither have courts in this circuit that have applied *Champion*.  *See, e.g.*,

8

*Champion*, 331 U.S. at 127, 129; *H.L. Hayden Co.*, 879 F.2d at 1022-24; *Cartier*, 396 F. Supp. 2d at 359; *Bumble Bee Seafoods*, 2004 U.S. Dist. LEXIS 13897, at \*6-\*15; *Eastman Kodak Co.*, 853 F. Supp. at 674.

Second, Plaintiffs argue that the disclosure is insufficient because it fails to disclose particular modifications to the movement or that Vortic sometimes uses parts from other antique Hamilton watch movements in its restorations. The only modification to the movement mechanism referenced in the record is the replacement of one lever which makes it easier for users to change time. At trial, Mr. Custer testified about how this modification works, describing it as a minor procedure that "doesn't alter the function of [the movement] at all." Tr. 48-49. This evidence is uncontroverted. Plaintiff has put forth no reason to believe that this apparently slight modification is particularly significant to consumers or that it is somehow material to a likelihood of confusion. With regard to Vortic's use of vintage parts from other antique Hamilton watches to complete its restorations, the Court finds that this is a technique that virtually anyone would expect in the restoration of an antique watch movement. *Cf. Champion*, 331 U.S. at 129 ("inferiority is expected in most second-hand articles."). Moreover, this technique is not material to the likelihood of confusion: the watch still contains an antique Hamilton watch movement with antique Hamilton watch parts. Mr. Custer's uncontroverted testimony at trial stated that when restoring a watch, Vortic only uses parts for the same model of watch movement. Tr. 115-116.

Finally, while most of Plaintiff's arguments are directed towards potential watch purchasers, Plaintiff briefly mentions the possibility of confusion on the part of members of the general public who observe the watch on a purchaser's wrist. While a Lancaster viewed on someone's wrist would still appear to contain a restored antique pocket watch movement, hands, and face that have been re-appropriated into a wristwatch, the viewer would not know that it was

9

Vortic rather than Hamilton that had done the restoration and modification.  Although it is true that "[t]he likelihood of confusion test concerns not only potential purchasers but also the general public[,] . . . such third parties are only relevant if their views are somehow related to the goodwill of the aggrieved manufacturer."  *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 382-83 (2d Cir. 1997).  Plaintiff has not articulated any basis on which to conclude that the appearance of its mark on the inner workings of the watch—visible only upon close inspection—would result in initial interest confusion among members of the public.

### The *Polaroid* Factors Support a Finding Against Infringement

When conducting a *Polaroid* analysis, "it is incumbent upon the district judge to engage in a deliberate review of each factor, and, if a factor is inapplicable to a case, to explain why." *Arrow Fastener Co.*, 59 F.3d at 400; *Bumble Bee Seafoods*, 2004 U.S. Dist. LEXIS 13897, at *19-24 (selectively applying *Polaroid* factors).  As the Court noted in its summary judgment opinion, a number of the *Polaroid* factors are not helpful to this case.  It concluded strength of mark and similarity factors are not relevant in a case where there is a modified genuine product with full disclosure.  Likewise, proximity of the products, bridging the gap, and the quality of the product are all also unhelpful, because application of these factors would penalize defendants who have only lightly modified a genuine product.  Yet, under *Champion*, these are the defendants who have the lowest burden to meet the full disclosure standard.  *See Champion,* 331 U.S. at 129.  The Court found that only actual confusion, the defendant's good faith, and the sophistication of the buyers are relevant *Polaroid* factors.

Plaintiff objects to this analysis, but fails to explain how these excluded factors comport with a *Champion* analysis.  The Court therefore adheres to its original conclusion.  However, the Court notes that even if it were to consider all of the *Polaroid* factors, the outcome would not change.

First, the Court agrees with Plaintiff that its mark is relatively strong. The mark is fanciful, rather than descriptive or suggestive. That alone, however, is not enough to enable a finding of infringement. Plaintiff has put forth scant evidence of distinctiveness in the marketplace. *See McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1132 (2d Cir. 1979) ("We view evidence concerning the origin-indicating significance of a mark in the marketplace as relevant to and probative of the strength of a mark and hence useful in assessing the likelihood of confusion."); *see also Streetwise Maps*, 159 F.3d at 744. And the Court notes that the Plaintiff has not shown that the mark's strength is of a kind such that the views of non-purchaser members of the public "are somehow related to the goodwill of the aggrieved manufacturer." *Landscape Forms*, 113 F.3d at 382-83.

Second, with regard to similarity, there is no question that the Lancaster contains the Hamilton mark. But similarity is not assessed in a vacuum. "In judging similarity, courts are to consider all factors that could reasonably be expected to be perceived by and remembered by potential purchasers." *Arrow Fastener Co.*, 59 F.3d at 394 (internal quotation marks and citation omitted). This includes "the overall impression created by the [marks] and the context in which they are found." *Star Indus.*, 412 F.3d at 386 (citation omitted). Presumably, the presence of disclosure from both advertisements and the watch itself would be critical to assessing the overall impression and context in which the Hamilton mark appears. This factor therefore would not support a finding of a likelihood of confusion.

Third, the proximity of the products factor would essentially be a wash. Plaintiff argues that the market for its products and Lancaster are the same because they both sell watches. But presumably there is substantial variation within the watch market. Plaintiff has not put forth any evidence that it makes a watch similar to the Lancaster, such as a wristwatch that looks like a pocket watch or any kind of restored watches. In fact, Plaintiff has put forth little information

11

about its own products other than the fact that they are watches and can be expensive.  Plaintiff has not shown that this factor supports a finding of a likelihood of confusion.

Fourth, with regard to the bridging the gap, Plaintiff concedes that this factor is irrelevant to this case, albeit for different reasons than the Court.  *See* Pretrial Memo, Dkt. No. 145 at 12-13 ("The bridging the gap factor, therefore, has no bearing on the question whether Plaintiff have adequately proven Defendants' liability.") (cleaned up).  Regardless, there is no question that Plaintiff has not submitted any evidence for this factor.

Fifth, the quality of the products factor would also not support a finding of a likelihood of confusion.  Plaintiff seizes on a 2014 comment made by Mr. Custer on a message board stating that the watch may be easily jarred and is not necessarily for everyday use.  *See* Exh. 8.  But even assuming that this comment was admissible evidence, it would be of no value to assessing the quality of the Lancaster one way or the other.  The Court credits Mr. Custer's testimony at trial that he had not built any watches at this point and he was "just speculating."  Tr. 39.  Plaintiff's counsel conceded that there was no "evidence as to the reliability of watches actually manufactured."  Tr. 146.  Likewise, there is virtually no evidence in the record about the durability, reliability, or overall quality of Plaintiff's products.

Turning to those *Polaroid* factors that are indisputably relevant in this case, the Court finds that they weigh heavily against a finding of a likelihood of confusion.

The Court finds that there is no evidence of actual confusion.  Plaintiff does not rely on consumer surveys to establish actual confusion.  Instead, Plaintiff attempts to establish actual confusion based only on a single email sent to a Canadian brand manager in 2015.  *See* Exh. 22.  The email states in relevant part: "my friend is looking for a vintage hamilton as per attached."  Plaintiff claims a Vortic advertisement was attached to an email.  As an initial matter the text of the email is quite vague.  It is unclear if the sender's friend is interested in a product that is

similar to Vortic's or actually thinks that Vortic's product was made by or is affiliated with Hamilton.

But there are more fundamental problems with the email. Plaintiff relied on the testimony of one of its employees, Mary Murielle Raveloson, to authenticate and lay the foundation for the email so it could be admitted. But on cross-examination, Ms. Raveloson testified that she was not initially in the forwarding chain in the email, as shown in the exhibit, and that it was sent to her later on. Tr. 137. More importantly, when asked whether the Vortic ad was attached to the email, Ms. Raveloson stated that she thought so based on her "assumption" and then stated that "I don't remember actually." Tr. 129. Based on her demeanor at trial, Ms. Raveloson seemed genuinely unsure as to whether the ad was attached to the email as well as the email provenance generally.

Due on these apparent deficiencies as to Exhibit 22's reliability, if not its authenticity, the Court concludes that it does not support a finding of actual confusion.

Next, the Court finds that Defendants demonstrated good faith in producing the Lancaster. At trial, Mr. Custer testified extensively about his intentions in starting Vortic and creating the Lancaster. The Court credits this testimony, concluding that he did not intend to cause consumer confusion but rather sought to "preserve American history" by salvaging and restoring the hearts of antique pocket watches. *See* Tr. 59; *see also* Tr. 32. Mr. Custer viewed himself as "upcycling," restoring previously nonfunctional antique watch movements and parts, and making them into something of "much greater value." Tr. 101. To be sure, Mr. Custer did intend to gain some benefit from displaying the Hamilton mark, albeit more from Hamilton's historical significance rather than its modern-day reputation. But the benefit Mr. Custer sought was no more than what he fairly believed he was entitled to by including restored, genuine antique Hamilton movements, hands, and faces. *See Champion*, 331 U.S. at 130 (noting that it

13

can be "wholly permissible" that the "second-hand dealer gets some advantage from the trade mark").

Last and perhaps most importantly, the Court finds that the customer base at issue is highly sophisticated. There is no dispute here that the Lancaster is very expensive. As the Second Circuit has explained, "[t]he greater the value of an article the more careful the typical consumer can be expected to be." *McGregor-Doniger*, 599 F.2d at 1137. This is especially true when it comes to watches. *See Swatch Group (U.S.) Inc. v. Movado Corp.*, No. 01-cv-286, 2003 U.S. Dist. LEXIS 6015, at *14 (S.D.N.Y. Apr. 9, 2003) ("The average consumer spending hundreds of dollars on a watch that will be worn for years is likely to give close attention to the type of watch he or she is buying."). The sophistication of the buyers is important in this case. The potential customer base for the Lancaster would be particularly attuned to the disclosure provided and would almost certainly seek out easily accessible information about the watch before making this substantial investment. If they do so, nothing in the record supports that they would be confused as to what extent Hamilton is connected to the watch.

\*\*\*

Weighing the full disclosure factor as well as the *Polaroid* factors together, the Court finds that there is not a likelihood of confusion in this case. As an initial matter, many of the *Polaroid* factors do not support a finding of infringement. It is true that the Hamilton mark is relatively strong and the Lancaster undoubtedly displays the Hamilton mark. But the adequacy of the disclosure as detailed in the above factual findings, combined with the sophistication of the customer base, eliminates any likelihood that a significant number of ordinary prudent purchasers would be confused as to the Lancaster's origins. Accordingly, Defendants are entitled to judgment on the trademark infringement claim.

**III.    REMAINING CLAIMS**

The Court also finds that Defendants are entitled to judgment on the remaining claims.

### A.   Federal Counterfeiting Claim

In order to prevail on a counterfeiting claim, Plaintiff must show that use of the counterfeit mark is "likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a); *see also Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 242 (S.D.N.Y. 2012) (observing that "counterfeiting is the hard core or first degree of trademark infringement.") (internal quotation marks and citation omitted). As discussed above, the Lancaster is not likely to cause deception or confusion. Therefore, Defendants are entitled to judgment on this claim.

### B.   New York State Dilution Claim

In order to establish a dilution claim under New York General Business Law § 360-*l*, a plaintiff must show, *inter alia*, a likelihood of dilution by blurring or tarnishment. *Deere & Co. v. MTD Prods.*, 41 F.3d 39, 42 (2d Cir. 1994).[2] Plaintiff relied solely on the standard for dilution by blurring and did not assert a claim for dilution by tarnishment. *See* Dkt. No. 145 at 42. As Plaintiff acknowledges, *see* Dkt. No. 145 at 42, "[t]o determine the likelihood of dilution by blurring [under New York law], courts consider six factors similar to the *Polaroid* factors." *Lapine v. Seinfeld*, 375 F. App'x 81, 85 (2d Cir. 2010); *see N.Y. Stock Exch., Inc. v. N.Y., N.Y. Hotel, LLC*, 293 F.3d 550, 558 (2d Cir. 2002) (six-factor New York dilution test considers "(i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark"). As discussed above, the *Polaroid* factors do not favor a finding of infringement. Defendants are therefore entitled to judgment on this claim.

### C.   Unfair Competition Claims

---

[2] Although Plaintiff's pretrial memorandum referenced the federal dilution standard, the Complaint never included such a claim, and Plaintiff's counsel confirmed at trial that Plaintiff is not pursuing a federal dilution claim. *See* Tr. 161.

15

The standard for a trademark infringement claim under 15 U.S.C. § 1114(1) is the same as the standard for an unfair competition claim under 15 U.S.C. § 1125(a). *See Mushroom Makers, Inc. v. R. G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1978) (per curiam) ("It is well settled that the crucial issue in an action for trademark infringement or unfair competition is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question."); *Legends Are Forever, Inc. v. Nike, Inc.*, 58 F. Supp. 3d 197, 205-06 (N.D.N.Y. 2014). A New York unfair competition claim is identical to its federal counterpart but adds the requirement that plaintiff must prove bad faith. See *LuxSoma LLC v. Leg Res., Inc.*, 289 F. Supp. 3d 514, 526-27 (S.D.N.Y. 2018). Because Defendants are entitled to judgment on the trademark infringement claim, they are entitled to judgment on these claims as well.

### IV. CONCLUSION

For the foregoing reasons, the Court finds in favor of Defendants on all claims. The Clerk of Court is respectfully directed to enter judgment and close this case.

Dated: September 11, 2020
       New York, New York

_____
ALISON J. NATHAN
United States District Judge